IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMANDA LYNN ZIEGLER,

                          Plaintiff,                          OPINION AND ORDER

      v.                                                      19-cv-391-wmc

ANDREW M. SAUL,

                          Defendant.

Plaintiff Amanda Ziegler appeals a denial of her application for disability and disability insurance benefits under 42 U.S.C. § 405(g).  She raises three, basic arguments on appeal: (1) the ALJ failed to properly consider the opinions of treating physicians and a mental health counselor regarding Ziegler's mental limitations; (2) the ALJ impermissibly substituted her own, unsupported judgment regarding those mental limitations for that of Ziegler's doctors; and (3) the ALJ did not properly consider Ziegler's use of an oxygen tank. For the reasons discussed below, as well as those discussed with the parties' counsel during oral argument on Thursday, April 23, 2020, the court will remand the decision of the Commissioner of Social Security.


BACKGROUND

A. Medical Record

Plaintiff Ziegler suffers from a variety of impairments, including asthma, diabetes, migraines, depression, and posttraumatic stress disorder.  (AR at 17.)  Consistent with plaintiff's asserted errors in the ALJ opinion, the court will focus its review of her medical

records on (1) opinion evidence related to Ziegler's mental limitations and (2) Ziegler's oxygen tank use.

On July 29, 2015, Dr. Sandra Frodin met with Ziegler for the purpose of completing a mental status evaluation after referral by the Social Security Administrator's Disability Determination Bureau.  (AR at 900.)  In terms of memory, Ziegler was "aware of past events," "was able to do digit span forward to 7 digits, but not 8," and "was able to do digit span backward to 4 digits, but not 5."  (AR at 902.)  In terms of concentration, Ziegler was able to "spell WORLD correctly forward and backward" and "was able to follow a three-step command and had no difficulty following [the] conversation."  (AR at 902.)  However, Ziegler "could not do Serial 3's."  (AR at 902.)  Finally, while Ziegler "could name 3 of the 4 states bordering Wisconsin," she "showed confusion and included Canada."  (AR at 902.)

Dr. Frodin further noted that Ziegler could "concentrate to read a book," she "enjoys reading and writing as hobbies," but she "can't concentrate around people."  (AR at 902.)  In the "statement of work capacity," Dr. Frodin also opined that she had a moderate limitation in her "[a]bility to understand, remember and carry out simple instructions" and her ability to "withstand routine work stresses."   (AR at 903.)  Ultimately, Dr. Frodin further opined that Ziegler had a moderate to marked limitation in her "[a]bility to respond appropriately to supervisors and co-workers," her "[a]bility to maintain concentration, attention and work pace," and her ability to "[a]dapt[] to changes."  (AR at 903.)

On August 19, 2015, state agency consultant Deborah Pape, Ph.D., completed a mental residual functional capacity assessment based on her review of Dr. Frodin's

2

findings.  (AR at 142-45.)  In the assessment, Dr. Pape opined that Ziegler was moderately limited in her ability to understand and remember detailed instructions, but could "understand, remember and carry out a three step command involving simple instructions." (AR at 143.)  Dr. Pape also found that Ziegler had some concentration and persistence limitations, including a moderate limitation in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them.  (AR at 143.)  Dr. Pape further concluded that Ziegler was moderately limited in her ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors.  (AR at 144.)  Finally, Dr. Pape found that Ziegler "would be suitable for work that does not require changing tasks from day to day."  (AR at 144.)

Dr. Frodin again examined Ziegler in person during January of 2016.  (AR at 1125-29.)  In terms of memory, Ziegler demonstrated that she was aware of past events, "could remember 2 of 3 objects after a 5 minute delay," "was able to do digit span forward to 6 digits, but not 7," and "was able to do digit span backward to 4 digits, but not 5."  (AR at 1127.)  In addition, Ziegler was again able to "spell WORLD correctly forward and backward," was able to "follow a three-step command," "had no difficulty following [the] conversation," and was not able to do serial 3's.  (AR at 1127.)  However, this time, Ziegler could only "name 1 of the 4 states bordering Wisconsin and included Idaho."  (AR at 1127.)

Ziegler also again reported reading as a hobby, being able to "concentrate to read a book," and having "300 to 400 books."  (AR at 1127.)  She also reported visiting Pinterest

and Facebook on her computer.  (AR at 1127.)  Once again, Dr. Frodin also opined that Ziegler had a "moderate to marked" limitation in her ability "to understand, remember and carry out simple instructions," ability "to maintain concentration, attention and work pace," "to withstand routine work stresses," and to "[a]dapt[] to changes."  (AR at 1128.) Finally, Dr. Frodin concluded that Ziegler had a moderate limitation in her "[a]bility to respond appropriately to supervisors and co-workers."  (AR at 1128,)

On January 27, 2016, state agency consultant Stacey Fiore, PsyD, submitted a mental residual functional capacity assessment at the reconsideration level.  (AR at 200-04.)  Relying on review of Dr. Frodin's earlier findings, as well as Dr. Pape's opinion, Dr. Fiore came to essentially the same conclusions as Dr. Pape, but also noted that Ziegler was "able to maintain attention, concentration, persistence, and pace for simple, routine tasks, for two hours at a time, over a normal workday/week, with normal supervision," even though she was "[n]ot able to carry out detailed instructions."  (AR at 201.)  With regard to Ziegler's adaptability, Dr. Fiore further opined that Ziegler could "tolerate simple changes in routine, avoid hazards, travel independently, and make/carry out simple plans." (AR at 202.)

On March 23, 2016, Ziegler met with James Deline, M.D., one of her primary care physicians.  (AR at 1369-71.)  Ziegler expressed concerns that she might have PTSD, yet noted the trouble she had making previous mental health appointments because of lack of access to a vehicle.  (AR at 1369.)  Ultimately, Dr. Deline wrote:  "It is very unlikely that this patient will work again and Disability probably makes sense for her, as much for psychiatric reasons, as well as her significant physical limitations . . . .  I do wonder about

4

the need for residential care for her given her inability to cope and manage her life." (AR at 1370.)

On June 8, 2016, Ziegler began individual therapy at the Mayo Behavioral Health Clinic. (*See* AR at 1341.) After meeting with Licensed Professional Counselor Kay Przywojsky periodically through February of 2017, however, Ziegler chose to end treatment. (*See* AR at 1342-43, 1340-51, 1758.) Przywojsky's records indicate that Ziegler struggled during this approximately eight month period with depression, anxiety, mood, negative self image, and other concerns. (AR at 1340, 1344-45, 1346, 1349.) Ziegler further reported difficulty with concentration (AR at 1351), felt she had ADHD, and requested a referral for an assessment (AR at 1340, 1344). She also had difficulty with interpersonal relationships due to irritability. (AR at 1351.) Nevertheless, Przywojsky's mental status exam revealed generally normal results, including "grossly normal" attention/concentration, "intact" long term and short term memory, and a "cooperative" mood. (AR at 1758.)

Beginning in June of 2017, Ziegler next met with Licensed Clinical Social Worker Cheryl Hagerman for outpatient psychotherapy. (*See* AR at 1551, 1521.) During their initial meeting, Ziegler reported that she had "anxiety and depression with insomnia, low self esteem," as well as "a poor memory." (AR at 1551.) Hagerman noted that Ziegler's cognition was "[i]mpaired due to memory issues," but that her thought process was "within normal limits." (AR at 1554-55.) Hagerman apparently met with Ziegler seven times between June of 2017 and February of 2018. (AR at 1521.) Other than her initial June 2017 treatment note, however, Hagerman's only treatment note in the medical record is

5

dated February 14, 2018.  (AR at 1546.)  After this February session, Hagerman noted

that Ziegler's thought process was "within normal limits," that she "reports distractibility,"

and that her cognition is "impaired due to memory issues."  (AR at 1546.)  Also on

February 14, 2018, Hagerman completed a mental work capacity questionnaire for Ziegler

(AR at 1521-26), opining in part that:

- Ziegler was "[i]ncapable of even 'low stress' jobs" because she was "easily triggered," had "memory problems," and suffered from "mood irritability + instability."  (AR at 1522.)

- Ziegler had "marked" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace ("CPP").  (AR at 1523.)

- Ziegler had "[t]otal occupation and social impairment."  (AR at 1523.)

- For 15% or more of an eight hour work day, Ziegler would be unable to perform many tasks involving understanding, sustained concentration, memory, social interaction, and adaptability.  (AR at 1524-25.)

Later that month, Taryn Lawler, D.O., also completed a similar questionnaire for

Ziegler, dated February 27, 2018.  (AR at 1529-38.)  Dr. Lawler became Ziegler's primary

care physician in November of 2016, keeping appointments with her approximately every

three months thereafter, or more often if needed.  (AR at 1529.)  Dr. Lawler opined in part

that:

- On some days, Zielger was "[c]apable of low stress jobs" while on other days she was "[i]ncapable of even 'low stress jobs.'"  (AR at 1530.)

- Ziegler had "extreme" difficulties in maintaining CPP.  (AR at 1533.)

- For 15% or more of an eight hour work day, Ziegler would be unable to perform many tasks involving understanding, sustained concentration, memory, social interaction, and adaptability.  (AR at 1524-25.)

- Based on all of Ziegler's physical and mental limitations combined, she would be off task more than 30% of an 8 hour work day, 5 day a week, competitive job.  (AR at 1532.)

Finally, as to Ziegler's use of an oxygen tank, she was found ineligible for oxygen based on testing in 2015.  (AR at 21-22, 974.)  However, in late 2017 or early 2018, Ziegler was prescribed an oxygen tank.  At the time of her hearing in March 2018, Ziegler used oxygen constantly, except for shutting it off for short periods to smoke. (AR at 20, 24, 42.)

## B. ALJ Decision

Ziegler filed an application for a period of disability and disability insurance benefits on May 11, 2015, alleging an onset day of February 24, 2015.  (AR at 14.)  After her claim was denied initially and on reconsideration, she requested a hearing before an ALJ.  (AR at 14.)  Present at the March 30, 2018, hearing were:  Ziegler; Christine Duncan, Ziegler's non-attorney representative; ALJ Deborah Giesen; and Matthew E. Sprong, a vocational expert.  (AR at 14.)  On May 10, 2018, ALJ Giesen issued a written decision, denying Ziegler's application.  (AR at 14-28.)

As is customary, the ALJ considered Ziegler's claim under the five-step, sequential framework set forth in the regulations.  (AR at 14-28.)  At step one, the ALJ found that Ziegler had not engaged in substantial gainful activity since her alleged onset date.  (AR at 17.)  At step two, the ALJ found that Ziegler suffered from a variety of severe medical conditions, and at step three, found that none of those conditions met or equaled the severity of a listing.  (AR at 17-19.)  At step four, the ALJ concluded Ziegler had the residual

functional capacity ("RFC") to perform sedentary work with the following, additional limitations:

- "simple, routine, repetitive tasks";

- "low stress work where changes are infrequent";

- "occasional interaction with coworkers and supervisors, but no interaction with the public";

- "accommodation of the use of oxygen (and presence of oxygen tank) at the work place";

- and various, other postural and environmental restrictions.

(AR at 19.)

In arriving at this RFC, the ALJ assessed Ziegler's medical record, including the various opinions in the record. (AR at 19-26.) The ALJ gave "some weight" to the opinions from the state agency psychologists, Drs. Pape and Fiore, although noted that "the overall record, including the updated evidence, supports the limitations in the residual functional capacity above." (AR at 25.) However, the ALJ accorded "very little weight" to the 2015 and 2016 opinions of Dr. Frodin, and little or limited weight to the opinions by Ziegler's primary physician, Dr. Lawler, and Social Worker Hagerman. (AR at 25-26.)

Finally, at step five, the ALJ concluded that Ziegler could not perform past relevant work, but could perform work available in the national economy, including final assembler, dowel inspector, and document preparer. (AR at 27-28.) The ALJ based this conclusion on testimony received from the VE at the hearing. (AR at 27-28.) With respect to the oxygen tank limitations posed by the ALJ in particular, the VE explained that he was unable to find any reference in the *Dictionary of Occupational Titles* or companion publications, but

8

rather based his conclusions regarding this limitation on his "professional experience, job placement, and . . . labor market surveys." (AR at 97.) Ultimately relying on the VE's finding that sufficient jobs existed in the national economy for someone with Ziegler's RFC, the ALJ found she was not disabled within the meaning of the Social Security Act. (AR at 28.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Edwards*, 985 F.2d at 336. If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). In particular, even when adequate record evidence exists to support the decision, the court may not

affirm if the Commissioner has failed to build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 2006).

Here, plaintiff Ziegler argues that: (1) the ALJ did not assign the proper weight to the opinions of Dr. Lawler, Social Worker Hagerman, and Dr. Frodin; (2) the ALJ impermissibly "played doctor" in arriving at the limitations in the RFC; and (3) the ALJ did not adequately consider Ziegler's need for an oxygen tank at work. (Pl.'s Br. (dkt. #11) 1.) The court will address each argument in turn.

## I. Opinion Evidence

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(c). An ALJ is further required to "determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. §§ 404.1545(a)(3), 404.1527(d), (f)). An ALJ is only required to ""minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). Still, an ALJ must provide "good reasons" for discounting or rejecting a source's opinion. 20 C.F.R. § 404.1527(d)(2); *Mandella v. Astrue*, 820 F. Supp. 2d 911, 922 (E.D. Wis. 2011) (citing § 404.1527(d)(2)).

### A.  Treating Physician Lawler's Opinion

The regulations instruct that "more weight" is generally given to opinions from treating sources.   20 C.F.R. § 404.1527(c)(2).[1]   Unless an opinion is given controlling weight, the ALJ must consider the following factors in deciding the weight to give to a treating physician's opinion: the length, frequency, nature and extent of the treatment relationship, the source's area of specialty, the degree to which the opinion is supported by relevant evidence, and the degree to which the opinion consistent with the record as a whole.  § 404.1527(c).

Nevertheless, the ALJ assigned "very limited" weight to the opinion of Dr. Lawler. The ALJ's stated reasons for discounting Dr. Lawler's opinion were succinct: "the limitations are not supported by the overall record, in either the claimant's clinical findings or activities of daily living."  (AR at 26.)  While an ALJ is only required to "minimally articulate" his or her reasons for discounting an opinion, *Clifford*, 227 F.3d at 870, the ALJ did not meet even this low bar here.

First, the ALJ appears to give no consideration to the presumptive, greater weight due treating physician opinions like Dr. Lawler's.  *See* § 404.1527(c)(2).  The failure to even acknowledge this presumption is particularly egregious in light of the fact that Dr. Lawler's opinion is the most recent assessment of claimant's mental limitations, was

---

[1] Under the rules that govern plaintiff's claim, a treating source's medical opinion may be entitled to "controlling weight" if, and only if, it is (1) "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case."  § 404.1527(c).  However, plaintiff in this case does not argue that any of Ziegler's treating physicians were entitled to controlling weight.

rendered approximately fifteen months after she had become Ziegler's treating physician (AR at 26), *and* post-dated the two state agency opinions -- to which the ALJ assigned "some weight" -- by over two years.  (AR at 25.)

Second, the ALJ claims that the "overall record" does not support Dr. Lawler's proposed limitations, yet the record contains numerous references to Ziegler's impaired memory, poor concentration, limited adaptability, and difficulty socializing.  (*See, e.g.*, AR at 903, 1128, 1351, 1554, 1546.)  Moreover, Dr. Lawler's and Social Worker Hagerman's opinions were largely consistent with each other, a fact which the ALJ also failed to acknowledge.  (*Compare* AR at 1521-26 *with* AR at 1529-38.)  The ALJ further ignored the fact that Dr. Lawler's opinion is consistent with Dr. Deline's, the only other treating physician to submit an opinion.  (*See* AR at 1370.)  To be sure, the record contains medical notes that suggest more robust mental functioning (*see, e.g.*, AR at 1758), but the ALJ's failure to discuss these complementary opinions by other medical treatment providers, much less explain why she believed Dr. Lawler's and their proposed limitations were not adequately supported, constitutes error.  *Clifford*, 227 F.3d at 870 (an ALJ's failure to "provide any explanation" to support a conclusion that a claimant's activities were inconsistent with a medical opinion "constitutes error"); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (an ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical opinion).

Third, "critical differences" exist "between activities of daily living and activities in a full-time job," including the fact that "a person has more flexibility in scheduling the former than the latter, can get help from other person[s] . . . and is not held to a minimum

standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).  Yet, without explanation, the ALJ somehow concluded that Ziegler's ability to play bingo, care for her cat or her ill roommate, or go on the internet would translate to adequate performance in a full-time job.  To the contrary, *none* of these activities by themselves suggest greater abilities than those found in Dr. Lawler's assessment with respect to concentration or remaining on task for an entire work day.

Fourth, in particular, Dr. Lawler's opinion contained greater limitations than those included in the ALJ's RFC with Ziegler's CPP limitation.  While the ALJ restricted Ziegler to "simple, routine, repetitive tasks," Dr. Lawler expressly opined that Ziegler had "extreme" CPP limitations, including being off-task 30% of a typical workday and being unable to perform many tasks involving sustained concentration and memory for 15% or more of a work day.  The Seventh Circuit has previously held that a limitation to simple, routine, and repetitive tasks does not adequately encapsulate general CPP limitations, such as those included in Dr. Lawler's opinion.  *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009).  Moreover, the only medical expert who appears to endorse the "simple, routine task" language was state agency psychological consultant Stacy Fiore, purportedly based on earlier findings by Drs. Frodin and Pape, both of whom failed to endorse this language, much less endorse it for an entire work day.  To the contrary, Frodin and Pape endorsed "moderate to marked" or "some" CPP limitations, respectively.  At minimum, therefore, the ALJ failed to explain her reason for using this language on this record.

### B. Hagerman's Opinion

Plaintiff further argues that the ALJ failed to give adequate weight to the opinion of Licensed Clinical Social Worker Cheryl Hagerman in particular.   Under the applicable regulations, social workers are considered non-medical sources and, therefore, cannot give "medical opinions."   *See* SSR 06-03p.   Nevertheless, the Social Security Agency recognizes that non-medical sources are "valuable sources of evidence for assessing impairment severity and functioning," especially where, as here, the source had a treating relationship with the claimant.   *See id.*   Opinions from non-medical sources are evaluated using the same factors identified above -- namely, the length, frequency, nature and extent of the treatment relationship, the source's area of specialty, the degree to which the opinion is supported by relevant evidence, and the degree to which the opinion consistent with the record as a whole.   *See* SSR 06-03p.

As previously noted, Hagerman's opinion, like Dr. Lawler's, included significantly greater limitations than those included in the ALJ's RFC.   Specifically, she opined that Ziegler had "marked" CPP limitations, including being unable to perform many tasks involving sustained concentration and memory for 15% of more of a workday.   (AR at 1523-25.)   She further opined that Ziegler (1) would be incapable of performing even "low stress" jobs and (2) had a total social impairment.   (AR at 1523-25.)   Nevertheless, the ALJ limited Ziegler to "simple, routine, repetitive tasks," "low stress work where changes are infrequent," and "occasional interaction with coworkers and supervisors."   (AR at 19.)   In discounting Hagerman's opinion, just as she did Dr. Lawler's, the ALJ offered the following reasons:

> The limited treatment notes from Ms. Hagerman do not
> support such extreme limitations, nor does the overall record.
> The claimant's mental status examinations throughout the
> record do not show such significant findings to support these
> limitations.  Nor do her activities of daily living support such
> level of impairment, as the record shows activities including
> playing bingo, caring for her terminally ill roommate, caring for
> cats, using the internet to access social media including
> Facebook and Pinterest, socializing, etc.

(AR at 26.)

However, these reasons suffer from many of the same defects identified above.  As an initial matter, the ALJ's claim that the "overall record" does not support the proposed limitations (1) does not acknowledge the fact that the record contains numerous references to Ziegler's significant mental limitations (*see e.g.*, 903, 1128, 1351, 1554, 1546); and (2) fails to acknowledge that Hagerman's opinion is largely consistent with Dr. Lawler's and Dr. Deline's opinions (*compare* 1521-26 *with* 1529-38 *and* 1370).  In addition, as discussed in greater depth above, the ALJ failed to explain why Ziegler's "everyday activities" were inconsistent with Hagerman's proposed limitations.  *See Clifford*, 227 F.3d at 870 ("The ALJ did not provide any explanation for his belief that Clifford's activities were inconsistent with Dr. Combs's opinion and his failure to do so constitutes error.").  Finally, the ALJ's finding that Hagerman's treatment notes do not support the opined limitations is flawed.  Although limited, Hagerman's treatment notes indicate Ziegler's impaired cognition due to memory issues, distractibility, and social anxiety (AR at 1554, 1546), all evidence which the ALJ similarly failed to acknowledge.  Regardless, the Seventh Circuit has previously admonished ALJs for requiring detailed treatment notes to support an opinion.  In *Herrmann v. Colvin*, 772 F.3d 1110 (7th Cir. 2014), the court wrote:

> The administrative law judge seems to have thought that a physician's evidence can be disregarded unless he has detailed notes to back it up and other physicians provide identical evidence even if they don't contradict him -- in other words no credibility without corroboration. These are insufficient grounds for disbelieving the evidence of a qualified professional.

*Id.* at 1111; *see also Brown v. Colvin*, 845 F.3d 247, 253 (7th Cir. 2016) ("[T]he mere absence of detailed treatment notes, without more, is 'insufficient grounds for disbelieving the evidence of a qualified professional.'") (quoting *Herrmann*, 772 F.3d at 1111); *Burgos v. Saul*, 788 F. App'x 1027, 1031 (7th Cir. 2019) (same).  For all the reasons identified above, the ALJ erred by failing to consider Hagerman's opinion adequately and failing to offer "good reasons" for discounting it.


## C. Conflicting Agency Opinions

Plaintiff next argues that the ALJ erred by assigning only "little weight" to the 2015 and 2016 opinions from state agency examiner Dr. Frodin.  In her decision, the ALJ explains the reasons for discounting Dr. Frodin's 2015 opinion as follows:  it was "based on a one time examination"; it was "not remarkable for significant memory or cognitive problems"; and Dr. Frodin "felt the claimant could handle her own interests and daily needs, despite her simultaneous opinion that she was unable to adapt to changes, keep a pace, interact appropriately, etc."  (AR at 25.)  The ALJ similarly discounted Dr. Frodin's 2016 opinion because:  "the examination itself does not support [the proposed] limitations, nor does the overall record which shows minimal treatment for the claimant's mental

health and activities inconsistent with marked mental impairment, including caring for a seriously ill individual." (AR at 25.)

Any time an ALJ "reject[s] or discount[s] the opinion of the agency's own examining physician" is cause for "a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). Here, the ALJ does so not once, but twice, with no good explanation. First, the ALJ failed to explain why she accorded more weight to the opinions from the state agency psychologists -- who examined only the paper record -- than to the opinions of Dr. Frodin as an examining source. *See* 20 § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Instead, to support her decision to assign the state agency psychologists' opinions "some weight," she simply stated that those opinions were "reasonable at the time they were provided." (AR at 25.) An opinion's "reasonableness" is *not* among the regulatory factors an ALJ is to employ in considering conflicting opinion evidence. *See* § 404.1527(c). This conclusory statement is a wholly insufficient basis for the court to evaluate the ALJ's reasoning. *See Villano*, 556 F.3d at 562 ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.").

Second, in claiming that the "overall record" did not support Dr. Frodin's opinions, the ALJ managed once again to ignore the evidence in the record that does in fact substantially support Frodin's proposed mental limitations, including references to Ziegler's impaired memory, poor concentration, limited adaptability, and difficulty socializing by her treating physicians, Drs. DeLine and Lawler, as well as her psychological

social worker Hagerman, and others.  (*See, e.g.*, AR at 903, 1128, 1351, 1554, 1546.) Further, the ALJ ignored the fact that the Dr. Frodin's two opinions rendered approximately six months apart were not only largely consistent with each other, but also that the more recent opinions from Dr. Lawler and Hagerman supported even *greater* mental limitations than those included in Dr. Frodin's opinions.  *See* 20 C.F.R. § 404.1527(c) (in assigning weight to an opinion, ALJ must consider the degree to which the opinion is consistent with the record as a whole); *Konda D. v. Saul*, 421 F. Supp. 3d 599, 612 (N.D. Ind. 2019) (ALJ erred in part by failing to acknowledge that an opinion was corroborated by other opinion evidence).

Third and finally, the ALJ failed to explain why Ziegler's care for her ill roommate was inconsistent with Dr. Frodin's proposed limitations.  Whatever those demands might have been, there is *no* indication that they were equivalent to the CPP requirements expected during an eight hour work day.  *See Clifford*, 227 F.3d at 870 ("The ALJ did not provide any explanation for his belief that Clifford's activities were inconsistent with Dr. Combs's opinion and his failure to do so constitutes error."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (criticizing ALJ reliance on fact that claimant cared for herself and her children without acknowledging differences between household and labor-market work).

For all of these reasons, the ALJ failed to adequately consider the opinion evidence presented by Dr. Frodin, Dr. Lawler, and Social Worker Hagerman.  Accordingly, the decision will be remanded for reconsideration of the medical opinions discussed above, particularly the most recent opinions of Dr. Lawler and Hagerman.

## II. ALJ Relying on Her Own Medical Opinions

Plaintiff also argues that the ALJ impermissibly interpreted certain medical records related to Ziegler's mental limitations.  (Pl.'s Br. (dkt. #11) 9-10.)  In particular, plaintiff points out that the ALJ gave some weight to the state agency psychologists' opinion from 2015 and early 2016, while acknowledging that more recent medical evidence supported a greater mental limitation.  (*Id.* (citing AR at 25 (according the state agency psychological opinion "some weight as they are reasonable at the time they were provided," but finding that "the overall record, including the updated evidence, supports the limitations in the residual functional capacity above")).)  Plaintiff points out as well that the ALJ did not claim to rely on *any* other, specific medical opinions in determining Ziegler's mental limitations.  (*Id.*)  According to plaintiff, therefore, the ALJ impermissibly "interpreted the more recently developed records, and determined what limitations should derive from those records."  (*Id.*)  Indeed, plaintiff argues, "the ALJ was behooved to either rely on other opinion evidence and conclusions reached in the record by medical experts or obtain other medical expert opinions," and she erred by failing to do either.  (Pl.'s Reply (dkt. #16) 5.)  In response, the Commissioner argues that the weight the ALJ gave to the state agency psychologists' opinions was appropriate, and the ALJ did not err in interpreting the more recent records.  (Def.'s Opp'n (dkt. #15) 15-16.)

At the outset, to the extent that plaintiff suggests that ALJ is *always* required to solicit a medical opinion in order to translate medical evidence into an RFC finding, she is simply mistaken.  In *Diaz v. Chater*, 55 F.3d 833 (7th Cir. 2007), the plaintiff similarly tried to argue that "ALJ erred in making the 'medical judgment' of [the claimant's] RFC"

and should have relied on the opinions of physicians. *Id.* at 306 n.2. The Seventh Circuit rejected that position, explaining that:

> The determination of RFC, however, is an issue reserved to the SSA. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a). That is, the SSA need not accept only physicians' opinions.

*Id.; see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (ALJ was not required to seek a medical source statement explaining what the claimant's limitations were from a physician in part because "the determination of a claimant's RFC is a matter for the ALJ alone -- not a treating or examining doctor -- to decide") (citing 20 C.F.R. § 404.1427(d)).

That being said, plaintiff cites to another line of cases holding that an ALJ cannot "play doctor" by *substituting* his or her own medical opinion for that of a physician. (Pl.'s Br. (dkt. #11) 9-10.) For example, in *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996), the Seventh Circuit found that the ALJ had "improperly substituted his judgment" for that of the claimant's physician. *Id.* at 970; *see also Schmidt v. Sullivan*, 914 F.2d 117, 119 (7th Cir. 1990) (ALJ impermissibly rejected evidence from treating physicians that claimant suffered from disabling heart disease only because claimant could play handball for forty minutes each week); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). In *Rohan*, in particular, the physician had opined that claimant suffered from major depression that limited his functional abilities, and "[w]ithout expressly relying on any medical evidence or authority," the ALJ was found to have

erroneously determined that the claimant's "efforts at engaging in a small machine repair/resale business" were incompatible with that diagnosis and limitation. *Id.*

Here, too, Ziegler's primary, treating physician Lawler and treating Social Worker Hagerman opined that Ziegler had greater mental limitations than those included in the ALJ's RFC, and in discounting these opinions, as well as rejecting the broader limitations advocated in the opinions of the agency physicians on which she purported to rely, the ALJ failed to point to *any* medical evidence to support specific limitations she adopted in the RFC to accommodate Ziegler's mental health challenges, including limitations in CPP, found by both Lawler and Hagerman, as well as examining agency physician Frodin.  (AR at 1521-26, 1529-38.)  Indeed, the ALJ herself acknowledged that evidence submitted after the non-examining state agency psychologists' opinions supported a greater RFC, and an ALJ may not rely on an outdated assessment if later evidence containing new medical information could have changed the assessment.  *See Moreno v. Berryhill,* 882 F.3d 722, 728-29 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018).

Regardless, the ALJ failed to cite to any medical evidence explaining her decision to adopt neither the limitations opined by the agency physicians nor by Lawler and Hagerman, but rather formulate her own limitations to accommodate for the mental health challenges she claimed to have credited.  In this sense, the ALJ was to some extent at least playing the part of a doctor by substituting her own judgment for theirs without medical support.  This, too, was error and requires remand.

### III. Oxygen Tank

Finally, plaintiff argues that the ALJ failed to address properly Ziegler's need for an oxygen tank at work.  (Pl.'s Br. (dkt. #11) 21.)  While plaintiff offers a number of reasons in support of this argument, none are persuasive.  To begin, plaintiff argues that the hypothetical posed by the ALJ to the VE did not fully encapsulate all the accommodations necessary for her use of oxygen at work.  In particular, plaintiff points out that the ALJ simply instructed the VE to consider the use and presence of an oxygen tank on Ziegler's ability to work, but failed to consider:  how often the oxygen would need to be changed; whether this would cause Ziegler to be off-task; or how Ziegler could bring and store heavy oxygen tanks at a workplace.  (Pl.'s Br. (dkt. #11) 21-23.)  However, Ziegler does not indicate that her use of an oxygen tank is atypical in any way and, therefore, the VE's testimony regarding the effect of needing oxygen in the workplace can be understood to incorporate the usual, expected limitations.  *See Hall v. Berryhill*, 2018 WL 8017182, at *15 (S.D.W. Va. Dec. 6, 2018), *report and recommendation adopted*, 2019 WL 495586 (S.D.W. Va. Feb. 8, 2019) (RFC that incorporated claimant's need to use oxygen constantly was adequate).

Next, plaintiff cites to a variety of cases finding that a claimant's need to use an oxygen tank at work would preclude competitive employment.  (*See id.* at 23-24 (citing cases).)  However, as pointed out by the Commissioner, plaintiff is effectively and impermissibly relying on the testimony of other vocational experts in other cases.  *See Higgins v. Saul*, No. 16-27, 2019 WL 4418681, *10 (D.D.C. Sept. 16, 2019).  Moreover, the Commissioner cites to a variety of other cases that found oxygen use *is* compatible with

competitive work.  (*See* Def.'s Opp'n (dkt. #15) 23 (citing cases).)  *See also Nettleman v. Comm'r of Soc. Sec.*, 728 F. App'x 473, 476 (6th Cir. 2018) ("[T]he Act and its regulations nowhere support the idea that disability benefits are automatically awarded if an individual uses supplemental oxygen, even continuously.").  Here, the court finds nothing in the record contradicting the VE's opinion that the plaintiff could perform the jobs contemplated -- particularly, document preparer -- much less require the ALJ to reject that opinion.

Plaintiff also argues that the ALJ should have inquired further into the VE's "experience," citing to a number of non-social security cases indicating that an expert witness's ultimate conclusion may be rejected if it is not supported by an adequate foundation, facts, or reasons.  (Pl.'s Br. (dkt. #11) 26-27.)  But as plaintiff herself acknowledges, the Rules of Evidence do not apply to social security cases (*id.* at 27), and an ALJ is entitled to rely on a VE's bottom-line conclusion, if uncontradicted.  *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion.").  Indeed, plaintiff did not even question the validity of the VE's testimony or present any additional evidence of limitations related to Ziegler's use of her oxygen tank in the workplace; accordingly, any objection is now forfeited.  *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir.), *on reh'g*, 368 F.3d 691 (7th Cir. 2004) ("[B]ecause Barrett's lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited.").

Finally, plaintiff suggests that the ALJ did not properly consider the VE's testimony regarding the availability of work in relation to evidence in the *Dictionary of Occupational Titles* ("DOT") and related publications.   (Pl.'s Br. (dkt. #11) 25-30.)   According to plaintiff, because the DOT does not discuss the need for oxygen, the VE's testimony regarding the availability of jobs given the oxygen tank limitation necessarily conflicted with the DOT, and the ALJ failed to resolve this conflict.  (*Id.*)  However, this court recently rejected a similar argument by plaintiff's counsel attempting to equate "the DOT's silence on a restriction" with "a conflict between the DOT and a restriction," holding "that interpretation drains the word 'conflict' of all meaning."  *Arms v. Berryhill*, No. 18-cv-476-jdp, 2019 WL 1352809, *4 (W.D. Wis. Mar. 26, 2019).  Accordingly, the ALJ did not err in failing to resolve a purely manufactured conflict between the DOT and the VE's testimony.

## ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Amanda Ziegler's application for disability and disability insurance benefits is REVERSED AND REMANDED for further proceedings consistent with the opinion set forth above.

Entered this 8th day of May, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

24